# Hromaha *v.* First National Bank of Braddock, Appellant.

*Banks and banking—Negligence—Fraud of agent—Collecting moneys from foreign lands.*

Where a bank, in order to secure the patronage of a foreign non-English speaking people in the community, establishes a department in charge of an employee who is able to converse with such people in their own language, and who is authorized by the bank to collect moneys from foreign lands, the bank will be liable to a man and wife who turned over to the head of this department the evidence of their owner-

ship of a fund in a foreign bank, if it appears that the fund in question was actually paid over by the foreign bank to the bank in question, and that the employee of the latter, through his position, and his ability alone to talk with the owners of the money, and through fraudulent combination with a confederate, secured the payment of the money to himself, and embezzled it.

Argued April 11, 1912.  Appeal, No. 48, April T., 1912, by defendant, from judgment of C. P. No. 1, Allegheny Co., Dec. T., 1906, No. 1,169, on verdict for plaintiffs in case of Defor Hromaha and Annie Hromaha, his wife, v. First National Bank of Braddock.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Assumpsit for money had and received.  Before MAC-FARLANE, J.

The facts are stated in the opinion of the Superior Court.

The trial judge charged in part as follows:

[Their claim is based simply upon the proposition that Bernolak had authority to represent the bank, that acting as he did he was really the bank, and that he committed a fraud upon them, of course they are met on the face of it with this pass book, which credits them with a deposit of $400 with the International Ticket Agency at Windber, Pa., "April 25, 1905, to deposit $400."  While I do not instruct you that this is a written claim between intelligent people who are able to read and write—and I do not mean that these people lack intelligence, but I mean between people who are not illiterate, it would require very much stronger evidence—nevertheless, when people have a bank book of this kind showing a contract of deposit with an entirely different institution they ought to satisfy you by the fair weight of the evidence that the contract was with the First National Bank of Braddock.  You ought to look at it with a great deal of care and scrutinize the transaction thoroughly.] [2]

[The defense is, and I shall go back to their case a little

bit more—the defense is in the first place, that admitting these things to be true, that would not make the bank liable because there is not evidence of this man's having authority, and as a matter of fact he did not have authority.   Taking that up first, there is no direct evidence here that he was authorized to receive the deposit.   The evidence so far as it is given in testimony as to what he was authorized to do, is that he was the foreign exchange clerk; that he at some time undertook to make collections, but that he was not authorized to receive deposits, that is what this amounts to, even if the money was in the bank, and their claim makes it practically a deposit.   There is no direct testimony that he was authorized to receive deposits, and upon that, suppose you find the rest of their case to be true, you have the question: Was he held out as such agent?

I do not think there would be any question if any one of us went into a bank, that we would understand if we wanted to make a deposit, we would go to the receiving teller, but the question is, if it be true that their money was in the bank, and had been collected, and they were dealing with him, whether the bank, knowing he was dealing with foreigners, held him out, allowed him to act in such a way that people would rightly suppose, honestly and fairly suppose, that he was representing the bank with such power.   That is on this principle: you can authorize a man directly to do a thing for you, and be bound by his act.   If you do not directly authorize him, if you authorize him to do something else, and at the same time put him in a position where people dealing with him would have the right to suppose he did have the other authority, you are bound by that.] [3]

[The plaintiffs' claim is that a fraud was committed upon them by a man who had authority and was held out by the bank as having authority to receive deposits; that is, to make this transaction for them.   So, if you find that the bank undertook to collect their money for them—and there is no question that some money came

from Hungary to the First National Bank, and that this transaction took place with Bernolak, and that he committed a fraud upon them, and that they were deceived, and that he had authority; that is, was held out as having authority, then they would make out a case that would entitle them to a verdict for the amount of their claim with interest.] [4]

Verdict and judgment for plaintiffs for $200. Defendant appealed.

*Errors assigned* were (2–4) above instructions, quoting them.

*F. S. Bennett,* of *Bennett & Benn,* for appellant.

*J. M. Friedman,* for appellees, cited: Steckel v. First Nat. Bank of Allentown, 93 Pa. 376; Ziegler v. First Nat. Bank of Allentown, 93 Pa. 393; Bos v. People's Nat. Bank of Tarentum, 41 Pa. Superior Ct. 388.

OPINION BY HEAD, J., July 18, 1912:

The appellant relies almost wholly on the proposition that the learned trial court committed reversible error in permitting the jury to return a verdict in favor of the plaintiffs without, as it alleges, any sufficient evidence to support such a verdict. As we view the evidence, no other course could have been adopted.

The testimony leaves no room to doubt that the plaintiffs were the owners of a sum of money in a bank in Hungary. They desired to have that money brought to this country where it would be more readily available for use by them. They belong to a class of unlearned, but by no means unthrifty people which has become quite numerous in and about our large industrial centers. To secure the patronage of this class, the defendant bank, like others in similar localities, maintained a department in charge of an employee who was able to converse with these people in their own language. There was evidence

that this employee, among his other duties, was authorized to collect moneys from foreign lands.

To accomplish their purpose, the plaintiffs went to the defendant bank and turned over to this employee the evidence of their ownership of the fund necessary to enable the defendant bank to collect it. His undertaking to do this was the undertaking of his principal. Had he intended honestly to discharge his duties, the records of the bank would have disclosed the transaction and shown that the money to be collected from the bank in Hungary was in fact the money of these plaintiffs. It could not be expected that the latter would have either knowledge of or control over the means to be adopted by the bank or its employee to secure possession of the money. It turned out that the servant of the bank proved unfaithful to his trust and selected a method of transmitting the money designed to enable him and his confederate to defraud either the bank or the plaintiffs or both. When, however, the bank obtained from the plaintiffs the necessary papers to enable it to secure possession of the money in Hungary, it became its duty to so supervise the subsequent acts of its servant as to see that the undertaking which he, representing the bank, had authority to begin should be faithfully carried out.

The bank alleges that the first information as to this transaction of which its general officers had knowledge, other than such knowledge as would be imputed to them because acquired by their agent in this very transaction, was contained in a letter of March 1, 1905, from the bank in Hungary: "We herewith let you know that Bodo Istavan (Stephen Bodo), Pittsburgh's Hungarian attorney, to your credit had paid 2533 Krones." This letter it will be observed contained in itself no information as to the proper application of the money which the defendant bank was thus advised was now in its possession and control. It therefore invited a prompt inquiry by the bank officers as to the origin of this fund and the disposition that should be made of it. If their servant,

in whom they placed confidence, and in whom they invited their patrons to have like confidence, deceived them, the loss resulting from his fraud should not be visited upon the innocent plaintiffs but must rather be borne by those who, by his selection and appointment, invited the public to deal with him.

Shortly after the transaction had reached this stage, the person referred to in the letter already quoted as Stephen Bodo presented himself at the bank. He was an entire stranger to its officers outside of the manager of the foreign exchange department, whose confederate he evidently was. He presented to the bank officers a letter addressed to himself from the bank in Hungary under the same date, March 1st, as follows: "Replying to your favor of February 13th, we kindly let you know we are enclosing No. 7070. Kromo Fedor and his wife Andrejko Anna's money which was deposited in Eperjesi Savings Bank and we had withdrew it. . . . As you requested for credit the First National Bank of Braddock had entered it and had notified them." This stranger then demanded that the money collected by the bank, belonging to the plaintiffs, be turned over to him, and it was then and there paid to him and his receipt therefor taken, and no part of it except the trifling sum hereafter mentioned ever reached the plaintiffs. When the latter, being advised by a card, apparently from the bank, that the money had been collected, again went there they again saw the same employee in charge of the foreign exchange department, with whom alone they could converse. He learned from them that only a small portion of their money would be immediately required. After deducting the bank's regular commission for its services, he paid them $38.00 in cash and gave to them a small book which he informed them showed that the bank still held $400 of their money subject to their demand. They were unable to read anything contained in this book and accepted it on the faith of his assurance. When, later on, this agent of the bank became a defaulter and the fact had become

public, the plaintiffs presented the book at the bank and were informed that it was worthless; that it contained no evidence of any indebtedness by the defendant to the plaintiffs but purported to be an obligation of an alleged bank or institution in Windber, Pa., of which the plaintiffs had never heard. The defendant therefore refused to pay to the plaintiffs the $400 or any part of it and this suit followed.

As we have already observed, the plaintiffs were the owners of the money in Hungary. They placed in the hands of the defendant bank, through its agent duly authorized for that purpose, the papers necessary to enable the defendant to receive into its own custody and control that money, and it was so received by the bank. It then became the plain duty of the latter to pay over that money to the plaintiffs or on their order, and from this duty they could not be absolved because by the fraud of their own servant they were misled into paying it to a stranger who had no claim whatever upon it. The record discloses nothing done by these plaintiffs to destroy their right to have the money that was clearly theirs, and in this respect they are in much the same situation as was the plaintiff in Bos v. People's National Bank of Tarentum, 41 Pa. Superior Ct. 388. In that case we said: "In the present case the testimony of the plaintiff tended to show that he was misled by the representations of the bank officer, whilst engaged in the service of the bank, into accepting the individual obligation of the officer under the belief that he was receiving an obligation of the bank for the repayment of his deposit with interest thereon. We are impelled to the conclusion that this was the same fraud, perpetrated in the same manner, that is disclosed by the record of the cases already cited (Steckel v. Bank of Allentown, 93 Pa. 376; Ziegler v. Bank of Allentown, 93 Pa. 393), and upon their authority we must hold that the learned trial court should have submitted this testimony to the jury."

We may concede that the testimony offered by the

defendant would, if believed, warrant a finding that the employee, Bernalok, had no authority to receive deposits, but that cannot be the material question here involved. He did have authority to make collections of money from foreign lands, and by the exercise of that authority the defendant bank actually received the money of these plaintiffs. When so received, the law created an obligation on its part to pay it over, and this obligation it has never discharged. It is clear, therefore, that the learned trial judge could not have properly directed a verdict for the defendant.

As to the manner in which the case was submitted, we fail to discover anything in the charge that could have prejudiced the defendant, or that would warrant a reversal of the judgment entered on the verdict for the plaintiffs. Indeed, had it not been that the credibility of the plaintiffs was necessarily subjected to the test of its acceptance by the jury, there would have been but little, if anything, to have prevented a binding direction for the plaintiffs. The assignments of error are overruled.

Judgment affirmed.